May it please the court and Ms. Nelson, my name is Logan Johnston and I represent the Arizona Health Care Cost Containment System popularly known as ACCS. I'd like to reserve three minutes for rebuttal if I can and for my argument I'd like to pose three questions that I hope you will consider as you decide whether the actions of CMS in this case were arbitrary and capricious. Two questions have to do with the reasons why CMS disallowed the sampling aspect of the case. Namely that the CMS hadn't approved Arizona's plan and that the plan wasn't explicit enough to approve it. So our three questions, Your Honor, are how can CMS claim access to CMS's failure to approve, disapprove, or even question our sampling plan? Second, what is it that CMS claims not to have understood about how our plan treated sampling forms from school personnel that were either not returned, incomplete, or inaccurate, collectively referred to as non-responsible? The third question is where did CMS meet its Also briefly address the second disallowance for missing documentation. Your Honor, Arizona knows better than to pick fights with the federal government, but these disallowances cried out for appeal because they seemed so arbitrary. This isn't the case of Arizona trying to game the system or sneak something by CMS or do anything but follow directions that CMS later admitted were ambiguous. Let me start with my third question. Did CMS meet its burden to show that Arizona increased federal reimbursement by $6,300,000 by excluding non-responses from its sample? The answer is it didn't. Counsel, what's the authority that it's CMS's burden versus your burden? They are the complaining party in the first instance, Your Honor. They have to tell us what their complaint is in sufficient detail for us to respond, and they merely posit a number of $6,300,000 with no explanation of why it is the valid number. Does the APA establish that they have that burden? They have relied upon the idea that their calculation is based on, quote-unquote, based on an OIG audit, and that's all they say. If you can demonstrate that the OIG audit didn't establish the basis for their argument, then we go back one step and they haven't either. CMS hasn't. No, I understand that argument. I just don't understand where you get the proposition that CMS has the burden of establishing the amount of the audit. There's at least a couple of district court opinions that suggest that it's the non-federal party that has that burden. And I agree if they had established the fundamental proposition that they have a complaint for what they say. In other words, they're trying to take our money, and so it stands to reason they should be able to explain why they've done it. That's my proposition, and I don't think they did. I think they presumed it. They made a calculation they can't defend. The $6,300,000 is merely how much less we would have been reimbursed if every one of the non-responsive were treated as non-Medicaid time and added to the sample. That makes no sense for several reasons, and this isn't elaborated upon by OIG. They don't say why they came to their conclusion, but what they've left out, Your Honor, is that a response that is not returned is an unknown. We don't know what the person who would have filled that form out would have said about the usage of his or her time, whether it was Medicaid or non-Medicaid. What CMS has done, and what OIG did, is simply take all those non-responsive, presume that they would have been non-Medicaid time, and throw them into the sample. There has to be some logical or legal justification for doing that for us to have... Well, Council, doesn't Arizona have the responsibility to prove its entitlement to the refunds or the reimbursement? So if there's no documentation to support it, then why not be able to throw it out? If you're referring, Your Honor, to the second disallowance... No, I'm referring in this instance. If a non-responsive, you don't know it's either Medicaid or non-Medicaid, and Arizona has the burden of proving that it was Medicaid, you can't do that, so why not just say that it's not Medicaid? Well, Your Honor, I think the issue should be on the foot of the party that's making the initial allegation and trying to take back $6,300,000. I believe they have to explain the basis for that demand, and here I don't think they did. Council, they made that demand, and you, on behalf of your client, responded, correct? Correct. And that went before the Departmental Appeals Board? Correct. And what's the standard of review for their ultimate determination? What do we have to conclude to rule in favor of your client? I think you have to conclude, Your Honor, that they did not supply a reasonable basis for their action or a reasonable explanation for their action. I think we will be arguing about whether or not what they did was arbitrary and capricious, obviously. And I think the cases are well established, especially in an instance like this, where the agency interpretation is announced for the first time in an enforcement proceeding. They have to be on the ball. They have to show that their explanation is thorough, that it is consistent with their past activities, and that it makes sense under the Skidmore decision. Council, what rule are you suggesting they announced for the first time through this enforcement action? There are a couple, Your Honor. The first and foremost is that non-responses that were inaccurate or incomplete had to be considered as non-Medicaid time. There is absolutely nothing in the 2003 guide, which they told us to follow, that even addresses incomplete or inaccurate responses. We were never told, either in that guide or otherwise, that that was their interpretation. We learned about that interpretation only in 2011, and only because OIG had to ask CMS in 2011, how do we treat these? Because their guide didn't say anything about it. So that is a completely unannounced interpretation that affects over half of the $6,300,000. Did you raise this issue before the DAB? Yes, Your Honor. Absolutely. There's nothing new about our argument here. So in broad form, as I understand it, you can focus down on the specifics as you want. The government said, we are disallowing these claims because we have no record to establish that it was covered by Medicaid or Arizona's Medicaid alternative. Is that right? Yes, we're talking about responses that we excluded from our samples because they were faulty data. Either because they hadn't been returned at all, and we had no idea what the person's activities were, or because they filled them out incompletely or inaccurately. We're talking about junk data. Isn't your client's obligation, when it submits claims for reimbursement under this system, to establish that it is covered by Medicaid or ACCESS? Well, Your Honor, take the non-responses that weren't returned. I don't know how we would do that because we don't know any more than CMS does what those forms might have said had the person returned them. To the extent they're incomplete or inaccurate, we don't know what the accurate and complete data would have been. All we did was exclude the bad data, go with what we knew we could understand and pass on to the federal government fairly. It just makes no sense to add in data that's faulty unless there's a clear direction from CMS that that's what they want. Well, Kelsey, you realize, you can see that if you did that, excluding the non-responses, that increases the percentage of Medicaid time, so therefore it would increase your funding. So it's not just, there would be a result, it's clearly a method that's in Arizona's favor. I'm not sure that's true, Your Honor, because we don't know what the correct data would have been. It could have favored us, it might have favored the government. That's my whole point. We don't know, and yet the federal government allocated all these as if they were conclusively non-Medicaid time. Mr. Johnson, you indicated you discarded them because they were faulty, and you had no direction, but wasn't the direction that if the items were faulty, instead of being discarded, they should have been coded as non-Medicaid activities? Isn't that in the guide? The guide, Your Honor, is by CMS's own admission, ambiguous. There are two paragraphs that deal with the subject, and they are found at Excerpt of Record 207. And the first paragraph says that to ensure an adequate number of responses, many schools oversample and sometimes substitute their responses for those that were not received. In other words, you have the option, if you are able to find an adequate number of responses in your sample, to just exclude non-responses. The second paragraph that the government realized was about, quote, another potential problem, is employees who are instructed to not complete the time study if they typically do not perform many Medicaid activities. To avoid this, all non-responses should be coded to non-Medicaid time codes. And the two paragraphs do not read the way the federal government did, because to read the second paragraph as excluding all non-responses makes the first paragraph contradictory. That's the one that says you can exclude non-responses so long as you have an adequate number total in your sample. And neither CMS nor OIG ever said that we had not enough responses. But it seems that those two paragraphs differentiate how you look at those non-responses and categorize one as that they should have been coded as non-Medicaid, and then perhaps the others could have been discarded. But it's my understanding they were just discarded with no differentiation. I'm sorry, Your Honor, I missed one word there. They were just what? Discarded. They were all discarded. There was no coding as non-Medicaid under that second part. Under the second part, as they read it, Your Honor, all non-responses have to be coded as non-Medicaid time. Correct. Did you decode any as non-Medicaid activities? No, because what we did, Your Honor, instead was to exclude all of these, whether they cut in our favor or the government's favor, because the data just, you know, it wasn't accurate, it wasn't complete, or it wasn't even available. So the federal government is making this presumption that if you don't do what they want and exclude all the, I'm sorry, count all the non-responses as non-Medicaid time, then they've been damaged. And there's no proof to establish that premise, that presumption. There's no citation of legal authority even to make it. But as I say, you're dealing with data that you just don't know how it was cut. And yet the federal government conclusively presumes that it all is in their favor. And it's only by doing that that they come up with the sampling disallowance of $6,300,000. Counsel, do you want to reserve some time for rebuttal? If I'm already at that point, Your Honor, yes, I would like to. Okay. Ms. Nelson? Good afternoon, and may it please the Court and Nelson on behalf of the United States Department of Health and Human Services. This Court should affirm the Departmental Appeals Board decision to disallow the $11.7 million federal financial participation because the decision was not arbitrary, capricious, or contrary to law. First, the DAB correctly upheld a $6.2 million disallowance because ACCESS used an unapproved data collection method that did not comply with the operative regulatory guidance. The 2003 CMS guide prescribed that absent CMS approval, no completed responses to time studies should be deleted or ignored, and that all non-responses to time studies should be coded as non-Medicaid activities. ACCESS implemented its 2004 plan excluding all non-responses and incomplete or inaccurate responses without CMS approval and contrary to the guide requirements. Now, ACCESS argues in this appeal that the CMS guide language was somehow ambiguous and that it could reasonably interpret the guide to allow for its treatment, but that is not the case. As both the DAB and the District Court below concluded, the CMS guide is reasonably clear and put ACCESS on notice that in the absence of a statistically valid and approved alternate methodology, all non-responses should be treated as non-Medicaid and no completed responses should be deleted or ignored. Now, this ramps up... Council, is the government's position any more complex than saying we won't reimburse what we cannot satisfy to ourselves was Medicaid appropriate? When it comes to brass tacks, Your Honor, I believe that's correct. Go ahead. I don't know if Judge Bumate had a... Yeah. Just raise your hand at the same time, so... Sure. So, yeah, thank you. So, the one thing I might push back on is when you were saying the guide is clear that all non-responses should be coded to non-Medicaid time study codes, what purposes that sentence is to avoid this. And there's a sentence before that which talks about when employees who are not instructed to complete time studies at all. So, I do think there is some question of whether that last sentence pertains to all responses or to that singular incidence where employees are not instructed to complete the time study. Well, as the DAB interpreted that sentence in the context of the paragraph and the overall purpose of the guide, it recognized that there are other potentially approved methodologies that account for these situations. But in the absence of these approved methodologies, such as an oversampling methodology or factoring in a non-response rate, which is discussed in that paragraph, in the absence of those approved alternative methodologies, the default expectation, which this is what the guide is setting forth, default rules for the states to follow in establishing their sampling methodologies, is that this is how they should structure them. Right. But you would agree with me that that last sentence that you cited is only referring to the sentence before it, to avoid this. You know, that's usually... Right. To avoid... Correct. To avoid that scenario, this is what we're instructing states to do. And that is an overall broad instruction so that all states follow that instruction unless they had a specific alternative methodology. Right. But that's not the situation we have here where Arizona had a potential problem with employees who are not instructed to complete the time study. Well, the problem we have here is that Arizona is excluding all non-responses in their entirety. And that, by doing so, would skew the sample pool. And that is the overall purpose of these instructions, is to prevent states from skewing their sampling pools in such a fashion that it would increase the overall federal reimbursement. Can I ask an unrelated question real quick? You know, opposing counsel mentioned that it was Arizona's burden. And I found it interesting. There wasn't really much case law on whose burden it is to prove any of these issues. There was a couple of district court opinions. Do you have any authority on whose burden it is to prove whether reimbursement is appropriate or not? Sure. So in the context of this case, so in a proceeding before the DAB, right, the initial burden of proof is on CMS to provide, you know, the factual basis for its disallowance sufficient to have the state be able to have notice and respond to that. And I believe the cases that we were able to find to support this are cited in our brief addressing this argument. But it is a minimal burden. And we'll submit that, you know, CMS met this burden. Its disallowance letter incorporated the OIG audit findings. The disallowance was based on the same dollar amount. And then if you look at the OIG audit finding itself, it explains the basis for the sampling disallowance. You know, relying on the CMS guide, that language, OIG found that Arizona was operating a noncompliant system. And so it took all of those excluded sample items, put it back into the sample, recalculated the statewide percentages, and the statewide federal reimbursement, and by following the default instructions in the guide, did in fact result in a lower federal share. So there was a factual basis for OIG's specific disallowance amount, contrary to Arizona's position. And that was more than sufficient to establish CMS's initial burden of proof before the DAB. And then the burden shifts to ACCESS to come forward with its evidence and arguments to show that the disallowance is somehow incorrect or contrary to law. And then obviously the DAB is sitting, you know, as the final agency decision maker in that proceeding on a de novo review of the record before it. And then this court reviews that under the APA's arbitrary and capricious standard. And that burden shifting dynamic that you're explaining, are those from those district court opinions in your briefs? Is there any statutory basis for it, or is that it? There, I know the DAB itself has, there's certain regulations governing the DAB's procedures that might be incorporated in that itself. There's also specific disallowance regulations about, you know, what the content of the disallowance has to say. And those are included in our brief at ADD, page 88. Those are the regulations on, you know, what the disallowance has to show. And that does include, you know, findings of fact on which the disallowance is based, or a reference to other documents previously furnished to the state, such as the OIG findings. Okay. So going back to discussion of the sampling disallowance, you know, ultimately the DAB did conclude that Arizona's alternative interpretation of the CMS guide that would allow it to exclude all of its non-responses or incomplete responses from its sample pool in their entirety and treat them as non-Medicaid was not a reasonable interpretation in light of the guide language. And the DAB's conclusion on that regard is reasonable and should be affirmed here. Now further, the record reflects that ACCESS never obtained CMS approval for its plan. And ACCESS suggests in its briefing here that CMS somehow conditionally approved the plan, but that's simply not the case. The record evidence shows that in an informal email, a representative from CMS told ACCESS that CMS still had questions on its plan and that until CMS formally approved the plan, it was relying on ACCESS's representations that the plan was drafted in conformance with the CMS guide. That's an indication that CMS was relying on ACCESS to follow the CMS guide. And the language in this informal email correspondence under these circumstances was not sufficient for ACCESS to assume that its plan was approved either conditionally or otherwise. The DAB reviewed this email and concluded that it did nothing to indicate CMS's approval of the plan and the DAB's view of this evidence under the substantial evidence standard should be affirmed. I'll also note that there's further evidence in the record indicating that ACCESS understood that it had not obtained approval to use its plan. Specifically, the plan document itself has on the front page and on the header of each page the language draft pending CMS approval. Next, the April 2008 letter from Maximus to ACCESS indicated specifically that absent specific approval by CMS to use a different method, ACCESS must treat non-responses as non-Medicaid, indicating that approval had not been given. And then ACCESS's response to that letter in May of 2008, agreeing to modify its methodology, demonstrated that they understood that CMS had not approved their methodology. So in sum, the record evidence does not support ACCESS's view that it had conditional approval to use its plan, but rather supports the conclusion reached by the DAB and the District Court that it did not have such approval. Moreover, it's beyond dispute that the CMS guide did require explicit approval for ACCESS's alternative methodology. And this is stated several places in the guide at ER 174, 205, and 207. Council, can I turn to the documentation claim? I had one question on that. The DAB disallowed all for the two quarters that there was no documentation, disallowed all the reimbursement for the... And Arizona reasonably says, well, why don't they consider a proportional disallowance? You know, averaging what the disallowance was over the other 17 other quarters that were analyzed. To me, that seems quite reasonable. Why is that not arbitrary and capricious to not even think about the proportional penalty? Based on the DAB's review of that, it was that it didn't have that authority to do that either as an equitable matter or a factual matter. In fact, you could argue the other side of that coin that applying Arizona has the burden to show the amounts of its claims. It can't show that for these two quarters. And so to rely on miscellaneous quarters to come up with a proportionate share for two discrete other quarters, that itself could be arbitrary and capricious and without a factual predicate. Is that true? Because it's obvious, based off of the other quarters, they are entitled to some amount of reimbursement. I don't know what percentage haircut it would be, but there's clearly reimbursable time there. So why exclude it all? It seems like an overly punitive penalty to say no reimbursement. And again, it's my understanding that the DAB did not believe it had such authority to do that proportional adjustment. Why not? Council, earlier in the argument, I asked you whether the government thought that excess was seeking reimbursement or claims that it could not justify. And you said, that's basically the brass tacks of our argument. Now you seem to be telling me that their action in not claiming reimbursement for actions that were incomplete or that they could not justify, justifies what the DAB did. Unconfuse me. I'm also quite confused by your question, Your Honor. You know, I... Well, I had the impression, let me... Sure, sure. It's basically... It's my impression. I had the impression with your initial argument that this case boiled down to reimbursement for some things that access could not supply, information indicating they were authentic Medicaid covered items, correct? Right. And I was... But now I hear you telling me that because they took out of what they complained, items which were non-responsive, incomplete or whatever, and therefore they couldn't determine if they were covered, they're still wrong. I think we're confusing two different buckets of the disallowance, Your Honor. Okay. With regard to... Obviously, there's one bucket of the disallowance that's based on the incomplete. I'm over my time. Is it okay if I continue? Absolutely. Absolutely. So that is based on the factoring in the incomplete and non-responses that they originally excluded. So we're factoring those in as non-Medicaid to adjust the percentage of the sample amount. And that's appropriate because, again, that applies the appropriate percentages to the invoices. And so I think your second part of the confusion maybe applies to that bucket of disallowance versus the other bucket of disallowance that I was discussing with Judge Bumate, which is with regard to approximately $5 million where Arizona just didn't have the documents to show that these claims were entitled to Medicaid. And in that sense, the DAB said, you don't have the documents, so we can't figure out if your claims are accurate, so we're disallowing the entirety of that amount. So I think that's where we may have gotten a little bit confused, Your Honor, and I'm happy to answer any further questions to clarify that if necessary. I do have one other question. Do either of you think this dispute is capable of mediation? You know, I'm happy. The government is open to settlement discussions. I'd have to discuss with my agency as well as the higher-ups within the department about authority. The Ninth Circuit has some wonderful mediators who are really good at sorting through this kind of thing. They're people with at least 10 years of private practice experience, and my experience over 25 years on the Court is that with very rare exceptions, they're able to get parties to come to an agreement. So why not do that? Or is that above your pay grade? I think the ultimate decision may be above my pay grade, Your Honor, and I'd have to defer to that guidance. Mr. Johnson? Your Honor, we would certainly be in favor of mediation as opposed to the existing result. Did you mean for me to now reply, do my rebuttal? Yes, go ahead. Yes, go ahead, and we'll give you two minutes since we took up a bunch of your time. Thank you, Your Honor. For some reason, I can't see the clock. We didn't skew this analysis at all, Your Honor. It's the federal government that is. Assume, for the sake of discussion, a hypothetical that our average rate was 6% of all these time forms being Medicaid time. With respect to the non-responses that weren't counted by us, we don't know whether that would have been a bucket of responses that came in at 7% or 5% or nothing. We simply don't know. But what the federal government has done is assume categorically that they're all at zero. The other thing I'd like to note is that we submitted our plan to CMS for approval long before it was used. CMS, as you just heard, informally told us on initial review it looks good and go ahead and use it so long as you follow the claiming guide. We thought we were following that guide. As they later admitted, it's ambiguous. So we thought we were doing what we should. We needed them to tell us if we weren't. We used our plan for four years precisely because they didn't say a thing after that initial informal comment. They never approved the plan, disapproved it, or questioned it. We are not to blame for that failure by them. The DAB just did not address the questions I've posed today. They provided no defense on the premise that our methodology had increased FFP, no justification for CMS's failure to act, no explanation of what CMS did not understand about our plan. States only receive federal reimbursement under Medicaid if they follow the federal rule. The question here is what happens when the federal government makes up rules as it goes along or even after the fact. So the state, having already done what it thought was wanted, cannot correct its action to meet the government's new interpretation. Counsel, you're just about out of time. Do you want to wrap up? I would just say, Your Honor, that here CMS and the DAB did not, as the answering brief argues, consider all relevant factors. They studiously ignored our questions, and the decision lacks the power to persuade that's required by Skidmore v. Smith. It should be removed. Thank you. Thank you, Counsel. Thank you both for your argument. That is the last argument today, and we stand in recess. I'm sorry, in adjournment. This court for this session stands adjourned.
judges: Hawkins, Cardone, Bumatay